UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL ALLEN BORUM,

              Plaintiff,              CIVIL ACTION NO. 10-14800

        v.                  DISTRICT JUDGE SEAN A. COX

COMMISSIONER OF             MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

              Defendant.

_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.    PROCEDURAL HISTORY

### A.    *Proceedings in this Court*

On December 3, 2010, Plaintiff Michael Alan Borum ("Plaintiff") filed the instant suit

seeking judicial review of the Commissioner's decision disallowing benefits (Dkt. No. 1).  Pursuant

to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), this matter was referred to the undersigned

for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of

disability and Disability Insurance benefits (Dkt. No. 2).  This matter is currently before the Court

on cross-motions for summary judgment (Dkt. Nos. 10, 12).  Plaintiff also filed a response to

Defendant's motion for summary judgment (Dkt. No. 14).

### B.    *Administrative Proceedings*

Plaintiff filed the instant claims on August 15, 2007, alleging that he became unable to work

on May 18, 2007 (Tr. 20, 124-133).  The claim was initially disapproved by the Commissioner on

October 26, 2007 (Tr. 20, 58-62).  Plaintiff requested a hearing and, on November 23, 2009, Plaintiff

appeared with counsel before Administrative Law Judge (ALJ) Elliott Bunce, who considered the case *de novo*. In a decision dated November 24, 2009, the ALJ found that Plaintiff was not disabled (Tr. 17-30). Plaintiff requested a review of this decision on December 9, 2009 (Tr. 15-16). The ALJ's decision became the final decision of the Commissioner on October 1, 2010 when, after the review of additional exhibits[1] (AC-12B, 20F, Tr. 118-123, 607-611), the Appeals Council denied Plaintiff's request for review (Tr. 1-5).

In light of the entire record in this case, I find that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

**STATEMENT OF FACTS**

    *A.    ALJ Findings*

Plaintiff was 42 years old on his alleged disability onset date (Tr. 25). Plaintiff has past relevant work history as a maintenance man (Tr. 157). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity from May 18, 2007 (Plaintiff's alleged disability onset date) through May 10, 2008; a period of less than twelve months (Tr. 22). The ALJ next found that step one that Plaintiff did engage in substantial gainful activity between May 11, 2008 and November 7, 2008, earning approximately $22,808 (*Id.*). The ALJ then found that Plaintiff was laid-off from his job, and thus did not engage

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

in substantial gainful activity between November 8, 2008 and November 24, 2009 (the date of the ALJ's decision) (*Id.*)

At step two, the ALJ found that Plaintiff had the following "severe" impairment: degenerative disc disease (Tr. 23). At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations (*Id.*). Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity (RFC) to perform "work that does not require: exertion above the sedentary level...or any climbing, balancing, kneeling, crouching or crawling; or more than occasional stooping; and allows the alternating of sitting and standing at will" (Tr. 23). At step four, the ALJ found that Plaintiff could not perform his previous work as a maintenance man (Tr. 24-25) At step five, the ALJ denied Plaintiff benefits, because the ALJ found that Plaintiff could perform a significant number of jobs available in the national economy, such as assembler (29,000 jobs in the national economy), machine operator (30,000 jobs in the national economy) or information clerk (85,000 jobs in the national economy) (Tr. 25-26).

### B.   *Administrative Record*

#### 1.   **Plaintiff's Testimony and Statements**

Plaintiff is a high school graduate with some post high school technical training in diesel mechanics (Tr. 39). During the hearing before the ALJ, Plaintiff testified that he did not work between May 18, 2007 and May 10, 2008, but that he was employed from May 11, 2008 to November 7, 2008 (Tr. 40-41, 51). Plaintiff stopped working in November 2008 because he was laid off (Tr. 43); he had been receiving unemployment benefits from the State of Michigan since December 2008 and, in order to receive benefits, he certified to the State that he was ready, willing, and able to work (Tr. 42-43).

According to Plaintiff, he continued to have back and knee pain, as well as pain radiating down his right leg (Tr. 44, 48). He stated that he was taking Flexeril (a muscle relaxant), which made him tired (Tr. 45). Plaintiff did not believe that he could handle a job that required him to lift or carry any amount of weight throughout an eight hour workday (Tr. 45-46); he could lift a gallon of milk, but had difficulty kneeling and could not squat or crawl (Tr. 48-49). Plaintiff testified that before a car accident in February 2009: he had difficulty sitting, could only walk 50-100 feet and stand for 10 minutes (Tr. 46-47), and could sit for only 15 to 20 minutes without having to change positions (Tr. 47). Plaintiff claimed that since the car accident, he could not walk far due to pain and often used a motorized shopping cart at stores (Tr. 50). Plaintiff spent 4 to 5 hours a day lying down or off his feet and stated that a friend performed all of his household chores (Tr. 47-48). Plaintiff testified that he propped his legs on a stool while sitting and, that due to his deep vein thrombosis, he occasionally had pain in the back of his legs (Tr. 49).

### 2.    Medical Evidence

Plaintiff presented extensive medical records to the ALJ, which the Commissioner accurately summarized as follows:

On May 18, 2007, Plaintiff had back surgery performed by Dr. Jawad Shah (Tr. 180-181). The surgical procedure included: a right-sided discectomy at L4-L5; a left sided discectomy at L3-L4; a right L4 hemilaminectomy; and a left L3 hemilaminectomy (*Id.*). The day after Plaintiff's back surgery, a Dr. Allen Trager examined Plaintiff and noted that Plaintiff also had a history of deep vein thrombosis (Tr. 182). Dr. Trager prescribed Vicodin (for pain) and Coumadin and Lovenox (anti-coagulents), and noted that Plaintiff was "medically okay," but cautioned Plaintiff that he needed to be more compliant with taking his Coumadin (*Id.*)

-4-

On May 30, 2007, Plaintiff saw Dr. Mark Rittenger for a sleep study (Tr. 183). After the sleep study, Plaintiff was diagnosed with obstructive sleep apnea, but Dr. Rittenger noted that Plaintiff's sleep apnea "respond[ed] nicely" when Plaintiff was fitted with a CPAP machine (*Id.*) Dr. Rittenger thus recommended continued use of the CPAP machine (*Id.*)

The next medical records in the file document 11 physical therapy appointments between July and August 2007 for treatment of lower back and leg pain; the records indicate that Plaintiff partially met his treatment goals during this time (Tr. 187-98, 212-13).

In September 2007, Plaintiff saw Dr. James Stathakios, Jr. for additional rehabilitation to return to the workforce (Tr. 257). At this time, Plaintiff complained of lower back pain radiating down the left leg, as well as mid-back and left shoulder pain (Tr. 257). Plaintiff reported that, prior to his back surgery, pain radiated down the right leg, but after surgery, it radiated down his left leg (Tr. 257-58). Dr. Stathakios noted that an x-ray taken one month earlier showed mild retrolisthesis of L5 with maintained vertebral body height (Tr. 210, 258). Dr. Stathakios stated that Plaintiff was off work and had a twenty-five pound weight lifting limitation (Tr. 259). Plaintiff exhibited a decreased range of lumbar motion and pain (Tr. 260). Plaintiff also had numbness in portions of his thighs and positive straight leg raising tests (Tr. 260). Dr. Stathakios prescribed Lyrica (a pain medication), and ordered an EMG study (Tr. 261). The EMG study showed evidence of left L4 radiculopathy (Tr. 268).

Later in September 2007, Dr. Stathakios indicated that Plaintiff was limited to lifting no more than 25 pounds above the waist, no bending or twisting while holding objects weighing more than 10 pounds, and no overhead movement while holding weights (Tr. 253). Dr. Stathakios prescribed Flexeril (a muscle relaxant) and Medrol (corticosteroid) and recommended continued physical

therapy (Tr. 253). The next month, Dr. Stathakios adjusted Plaintiff's medications and prescribed an electrotherapy device (Tr. 254).

In October 2007, Dr. Andrew Friessen examined Plaintiff for the state DDS (Tr. 227-29). Plaintiff primarily complained of back pain and stated that his radicular symptoms resolved after surgery (Tr. 227). He stated that he had difficulty shopping and reported that he could sit or stand for one-half hour and walk only limited distances at home (Tr. 227). Plaintiff had a normal gait, did not use an ambulatory device, and had mild difficulty heel and toe walking (Tr. 228). Plaintiff exhibited decreased ranges of lumbar spine motion and positive bilateral straight leg raising tests (Tr. 228).

Plaintiff again presented to Dr. Stathakios in November 2007 after having seen Dr. Neil Friedman for a disability evaluation and second opinion (Tr. 255). It was noted that Dr. Friedman recommended lifting no more than 25 pounds above the waist and no repetitive bending and twisting (Tr. 255). Dr. Stathakios managed Plaintiff's medications, continued his work restrictions, and ordered an MRI (Tr. 255). The next month, Dr. Stathakios noted that the MRI showed a recurrent disc bulge at L4-5 with irritation to the left L4 nerve root and a disc bulge at L5-S1 irritating the S1 nerve root (Tr. 256, 267). Dr. Stathakios indicated that Plaintiff continued to have slow mobility and displayed decreased lumbar motion and trunk muscle deconditioning; Plaintiff was referred back to Dr. Shah, Plaintiff's back surgeon (Tr. 256).

In January 2008, Dr. Stathakios managed Plaintiff's medications (Tr. 265). Later that month, Plaintiff presented to Dr. Shah for treatment of myofascial pain syndrome and post-laminectomy syndrome with right L3 scar tissue (Tr. 273). Plaintiff complained of bilateral leg pain (Tr. 273). Plaintiff had positive straight leg rasing tests bilaterally, and Dr. Shah recommended left-sided L4-L5 and L5-S1 discectomies and fusion followed by physical therapy (Tr. 273-74). Dr. Shah opined that

Plaintiff had a pinched nerve on the left and that surgery would improve his radiculopathy and possibly improve his back pain (Tr. 274).

In February 2008, Dr. Shah performed a second back surgery on Plaintiff due to left-sided S1 radiculopathy and discogenic back pain (Tr. 320-21). This surgery consisted of: L5-S1 decompression with foraminotomy and discectomy; left-sided L4-L5 foraminotomy and scar tissue removal; posterolateral effusion between L5 and S1; posterior instrumentation with spiral plate from L5 to S1; an interbody fusion device at L5-S1; and placement of bone morphogenic protein (Tr. 320). The day after surgery, a doctor provided a plan for Coumadin usage given Plaintiff's history of deep vein thrombosis (Tr. 310). Lumbar spine x-rays during the two days after surgery showed, in addition to surgical devices, narrowing of the L5-S1 disc space and mild spurring (Tr. 339-40). Plaintiff was discharged three days after surgery, at which time he was instructed to: use an LSO brace; slowly increase walking; avoid bending, twisting, and lifting more than 10 to 15 pounds; and not drive until told otherwise (Tr. 307). Plaintiff was prescribed Valium and Vicodin (Tr. 317).

Plaintiff presented to Dr. Stathakios later that month for medication management and complained of low back pain and bilateral leg pain down to his feet (Tr. 266). He had a limited back range of motion due to pain; Dr. Stathakios prescribed Celebrex for anti-inflammatory control and renewed prescriptions for Vicodin, Flexeril, and Lyrica (Tr. 266).

About one week later, Plaintiff returned to Dr. Shah and reported that he had some pain, but was feeling "a lot better" overall (Tr. 449). Dr. Shah prescribed Decadron (a corticosteroid) and advised Plaintiff to use extreme care when performing daily activities and not to bend for at least three months (Tr. 449).

Plaintiff presented to Dr. Stathakios in March 2008 for a follow-up appointment and it was noted that he was making gradual, but steady functional progress (Tr. 262-64). A lumbar spine x-ray

that month showed stable post-operative changes with a transitional segment in the lumbosacral junction (Tr. 298).

In April 2008, Plaintiff presented to Dr. Shah for a follow-up appointment and reported significantly improved back pain (Tr. 283).  Dr. Shah noted that a March 2008 lumbar spine x-ray showed good alignment and stability, and he recommended physical therapy followed by a return to work (Tr. 282-83).  Later that month, Dr. Stathakios noted that Plaintiff was active in a physical therapy program and that he displayed improved, but limited, range of back motion and functional lower extremity strength (Tr. 264).  Dr. Stathakios released Plaintiff to unrestricted, full duty work as of May 12, 2008 (Tr. 264).  At the end of April 2008, Dr. Shah questioned whether Plaintiff's symptoms were due to arthritis because Plaintiff's significant lower back pain improved profoundly after taking Aleve, but worsened with physical therapy (Tr. 285-86).  Dr. Shah recommended that Plaintiff visit a rheumatologist and released him to full-duty work with no restrictions (Tr. 285).

In June 2008, Plaintiff presented to Dr. Garfield for follow-up to his back pain and medication management (Tr. 289-90).  Plaintiff had right lower paraspinal muscle tenderness, sacroiliac tenderness, and moderately reduced extension and flexion (Tr. 289).  Dr. Garfield prescribed Vicodin for myofascial lower back pain (Tr. 290).  Plaintiff returned to Dr. Garfield in September 2008 to check his results from anticoagulation laboratory testing; musculoskeletal examination results were the same as in June 2008 (Tr. 569-70).  Dr. Garfield diagnosed coagulation defects and myofascial lower back pain and prescribed Coumadin (Tr. 570).

In November 2008, Plaintiff presented to Dr. Hal Martens, a rheumatologist for evaluation of chronic back pain (Tr. 555).  Dr. Martens opined that Plaintiff's pain was mostly mechanical in nature and ordered laboratory tests to rule out an inflammatory cause (Tr. 555).

Plaintiff presented to the emergency room in February 2009 following a car accident and reported lower back and right knee pain (Tr. 535-37). A lumbar spine x-ray showed, in addition to fusions, maintained vertebral height and intervertebral disc spaces, satisfactory alignment, and minimal spurring at L5 (Tr. 540). Plaintiff was found to have multiple back and lower right leg contusions and was discharged (Tr. 536).

In April 2009, Plaintiff presented to Dr. Mark Dyball with complaints of pain over the lateral aspect of the right knee (Tr. 531). Plaintiff could not duck walk and had: pain in his right knee at the lateral joint line; a grade III laxity of the posterior cruciate ligament (PCL) on Lachman and drawer testing; a positive active quadriceps test; a posterior sag; a positive Steinmann maneuver; and +1 effusion (Tr. 531). Dr. Dyball diagnosed a grade III tear of the PCL in the right knee and a torn lateral meniscus (Tr. 531). He recommended right knee arthroscopy followed by physical therapy (Tr. 532). Plaintiff underwent right knee surgery in April 2009 (Tr. 533-34), and Dr. Dyball subsequently noted that surgery revealed a grade III tear of the PCL, a torn lateral meniscus, and chondromalacia of the patella, medial femoral condyle, medial tibial plateau, and lateral femoral condyle (Tr. 530). Plaintiff had grade III laxity of the PCL with obvious posterior sag and a positive drawer test; Dr. Dyball provided a PCL brace and recommended physical therapy (Tr. 530).

Plaintiff attended 11 physical therapy appointments in May and June 2009 (Tr. 550, 591-95). During his initial evaluation, Plaintiff complained of difficulty walking and right knee pain, swelling, and weakness (Tr. 591). A physical therapist noted minimal swelling and effusion and 3/5 strength (Tr. 591). At discharge, a therapist noted that Plaintiff had good improvement with increased range and strength and that he could walk one mile on a treadmill (Tr. 550).

In June 2009, Plaintiff reported to Dr. Dyball that his right knee was beginning to feel much better (Tr. 529). Plaintiff had a positive drawer test with PCL laxity, posterior sag, and a positive

active quadriceps test (Tr. 529).  He was advised to complete physical therapy and perform home exercises (Tr. 529).  During a follow-up appointment the following month, Dr. Dyball noted that Plaintiff continued to complain of pain and had prepatellar bursitis; he, administered a steroid injection (Tr. 527).

Later in June 2009, Plaintiff presented to Dr. Garfield and complained of right knee pain, swelling, and popping (Tr. 579-80).  Plaintiff again had right lower paraspinal muscle tenderness, sacroiliac tenderness, and moderately reduced extension and flexion (Tr. 579).  He walked with an antalgic gait and had lateral knee tenderness on the right and knee effusion (Tr. 580).  Dr. Garfield refilled Plaintiff's Vicodin and referred him to Dr. Dyball (Tr. 579-80).

Plaintiff returned to physical therapy in July 2009 with complaints of right knee pain, stiffness, and weakness, and complained of increased swelling since Dr. Dyball provided the steroid injection (Tr. 586).  On examination, a physical therapist noted moderate swelling in Plaintiff's prepatellar bursa and 4/5 strength (Tr. 586).  Plaintiff attended 12 physical therapy appointments between July and August 2009 (Tr. 586-90).

Plaintiff returned to Dr. Garfield in August 2009 with complaints including knee swelling, clicking, and tenderness (Tr. 581).  Plaintiff had the same spine findings as in June 2009, and also had an antalgic gait, prepatellar effusion, and tenderness in his right knee (Tr. 582).  Dr. Garfield diagnosed lower back myofascial pain and prepatellar bursitis and continued Plaintiff on Vicodin and Flexeril (Tr. 581-82).

Plaintiff presented to Dr. Garfield in October 2009 for medication management and requested a temporary handicapped parking permit (Tr. 598).  Plaintiff had prepatellar effusion, anterior knee tenderness, and tenderness of the lateral collateral ligament and lateral meniscus (Tr. 598).  Dr. Garfield refilled Plaintiff's Vicodin and referred him to Dr. Dyball (Tr. 598-99).  Later that month,

Plaintiff presented to Dr. Dyball and reported knee soreness and pain at times (Tr. 604). Dr. Dyball noted that Plaintiff's prepatellar bursitis had resolved and that he had grade II laxity of the ACL (Tr. 604). Dr. Dyball stated that he would recommend a Synvisc-One injection in the near future and opined that a total knee arthroplasty would be required to ablate all of Plaintiff's pain (Tr. 604). Dr. Dyball recommended weight loss and stated that he would wait as long as possible before performing an arthroplasty due to Plaintiff's young age and activity level (Tr. 604).

Plaintiff returned to Dr. Dyball in November 2009 for a Synvisc-One injection in the right knee (Tr. 603). He had no erythema, swelling, or effusion (Tr. 603). Dr. Dyball diagnosed advanced osteoarthritis of the right knee and administered the injection (Tr. 603).

Plaintiff submitted additional evidence from Dr. Garfield to the Appeals Council; that evidence is also attached to Plaintiff's motion for summary judgment (Dkt. 10). The additional evidence consists of a report, filled out in August 2010, in which Dr. Garfield opines that Plaintiff could occasionally lift and carry 10 pounds, frequently lift and carry less than 10 pounds, stand and/or walk for less than 2 hours per workday, and sit for less than 6 hours per workday (Tr. 607-08). Dr. Garfield stated that Plaintiff needed to alternate between sitting and standing and must elevate his legs frequently due to his lower back condition, history of deep vein thrombosis, and right knee osteoarthritis (Tr. 608). Dr. Garfield stated that Plaintiff could never perform any postural activities and could only occasionally reach and handle (Tr. 608-09). He opined that Plaintiff could have limited exposure to temperature extremes, vibration, humidity/wetness, and hazards (Tr. 610).

### 3.    Vocational Expert

At the hearing, the ALJ asked a vocational expert (VE) what work could be performed by a person with Plaintiff's vocational profile who could perform sedentary work with the following non-exertional limitations: no climbing, balancing, kneeling, crouching, or crawling; no more than

occasional stooping, and the ability to sit and stand at will (Tr. 52-53). The VE testified that such a person could work as an assembler, machine operator, and information clerk, and that there were a total of 5,500 such jobs in the regional economy (Tr. 53).

### C.      Plaintiff's Claims of Error

Plaintiff raises several arguments on appeal, which can be summarized as follows: (1) that the ALJ erred in not finding additional "severe impairments" at step two of the analysis, in particular, Plaintiff's knee condition, chronic fatigue/sleep apnea, deep vein thrombosis and obesity; (2) that the ALJ erred by not accounting for all of Plaintiff's impairments in the controlling hypothetical; (3) that the ALJ erred by not recognizing an earlier disability onset date; (4) that the ALJ erred in not finding that Plaintiff needed to elevate his legs throughout the day; (5) that the ALJ erred in assessing Plaintiff's credibility; and (6) that the Appeals Council erred by not considering additional documents provided by Plaintiff, in particular, the August 2010 report from Plaintiff's treating physician, Dr. Garfield.

## DISCUSSION

### A.      Standard of Review

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

-12-

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different

-13-

conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *See Wyatt v. Sec'y of Health & Human Serv's.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x. 521, 526 (6th Cir. 2006).

### B.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act,

including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq.*)

and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq.*).

Title II benefits are available to qualifying wage earners who become disabled prior to the expiration

of their insured status; Title XVI benefits are available to poverty stricken adults and children who

become disabled.  F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984).  While the two

programs have different eligibility requirements, "DIB and SSI are available only for those who have

a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful
> activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments, that "significantly limits...physical or
> mental ability to do basic work activities," benefits are denied without
> further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful
> activity, has a severe impairment that is expected to last for at least
> twelve months, and the severe impairment meets or equals one of the
> impairments listed in the regulations, the claimant is conclusively
> presumed to be disabled regardless of age, education or work
> experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant
> work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past
> relevant work, if other work exists in the national economy that the

-15-

claimant can perform, in view of his or her age, education, and work
experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§

404.1520, 416.920; *Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at

any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of

limitations caused by his impairments and the fact that he is precluded from performing his past

relevant work." *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540. If the

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers

to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth

step, the Commissioner is required to show that "other jobs in significant numbers exist in the

national economy that [claimant] could perform given [his] RFC and considering relevant vocational

factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C.   *Analysis and Conclusions*

As noted earlier, Plaintiff raises several argument on appeal. Each argument is considered

below:

#### 1.   **The ALJ Did Not Err At Step Two**

Plaintiff's first argument is that the ALJ erred at step two of the analysis by only recognizing

Plaintiff's degenerative disc disease as a severe impairment, and by not recognizing additional severe

impairments, in particular Plaintiff's knee condition, chronic fatigue/sleep apnea, deep vein

thrombosis and obesity. Defendant responds that, under these circumstances, the failure to find an

impairment severe is not reversible error, citing *Maziarz v. Sec'y of Health and Human Serv's*, 837

F.2d 240, 244 (6th Cir. 1987). Defendant is correct.

-16-

In *Maziarz*, the ALJ determined that the plaintiff suffered from several severe cardiac impairments. The plaintiff argued the ALJ erred by not finding a cervical condition to be a severe impairment at step two of the sequential evaluation process.   The *Maziarz* Court found it "unnecessary to decide" whether the ALJ erred in failing to find that the plaintiff's cervical condition constituted a severe impairment at step two, because the ALJ continued with the remaining steps of the sequential evaluation process and considered the plaintiff's cervical condition in determining whether he retained a sufficient RFC to allow him to perform substantial gainful activity.  Therefore, the Sixth Circuit concluded that any alleged error at step two was harmless.  Stated differently, the Sixth Circuit held that, as long as the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the ALJ's failure to specifically find additional severe impairments at step two "[does] not constitute reversible error." *Maziarz*, 837 F.2d at 244; *see also, Swartz v. Barnhart*, 188 Fed. App'x. 361, 368 (6th Cir. 2006) (citing *Maziarz*).

In this case, the ALJ found at step two that Plaintiff's back condition was a severe impairment and then proceeded to the following steps in the five-step analysis (Tr. 23).   In determining Plaintiff's RFC, the ALJ found that Plaintiff's back condition, deep vein thrombosis and knee injury could reasonably be expected to limit Plaintiff's exertional capacity and range of motion (Tr. 24).  The ALJ ultimately concluded that Plaintiff was limited to sedentary work, with only occasional stooping, no other postural activities, and the option to sit or stand at will (Tr. 23-24).  As to Plaintiff's alleged chronic fatigue/sleep apnea, the ALJ's decision not to specifically include this impairment into the RFC is supported by substantial evidence, since the medical records indicated that Plaintiff's sleep apnea was well-controlled through the use of a CPAP machine (Tr. 183).   Thus, the ALJ specifically accommodated for all of Plaintiff's medically determinable impairments in the RFC – including Plaintiff's knee injury and the effects of his deep vein

-17-

thrombosis.  Accordingly, the ALJ's finding at step two that Plaintiff did not have a severe knee condition or deep vein thrombosis is not reversible error.

### 2. The ALJ Accounted For All Of Plaintiff's Impairment In The Hypothetical

Plaintiff's next argument on appeal is related to his first argument.  Specifically, Plaintiff argues that the ALJ did not properly consider all of Plaintiff's impairments in the controlling hypothetical. This argument is also not well-taken.  As discussed above, the ALJ properly accounted for all of Plaintiff's impairments – specifically Plaintiff's back and knee conditions – in the hypothetical.

Plaintiff also argues that the ALJ did not consider the work related effects of his obesity. While obesity by itself does not constitute a disability, pursuant to SSR 02–01p, obesity must be considered in combination with other impairments in determining whether Plaintiff is disabled.  The record in this matter, however, indicates that the ALJ did not err in failing to specifically discuss Plaintiff's alleged obesity.

No medical source in the record diagnosed Plaintiff as obese; Dr. Dyball examined Plaintiff's right knee in October 2009 and recommended that Plaintiff lose weight (Tr. 604).  Aside from this isolated recommendation, it does not appear that Plaintiff's treating physicians identified Plaintiff's weight as significantly impacting his other medical conditions.   In October 2007, Dr. Friessen examined Plaintiff and found that he had an obese abdomen (Tr. 228).  Although the ALJ did not specifically mention Dr. Friessen's observation, the ALJ explicitly found that Dr. Friessen's examination results were consistent with the RFC assessment (Tr. 24).   The fact that the ALJ did not discuss Plaintiff's weight was not error, as there is minimal evidence in the record that Plaintiff's alleged weight affected his other conditions or contributed to his functional limitations.

Furthermore, even under the plain language of SSR 02-01p, just because Plaintiff might have had a BMI above the recommended level does not mean that he was obese. *See, e.g.*, SSR 02-1p, 67 Fed.Reg. 57,859, 57,860-62 (Sept. 12, 2002) ("[S]omeone with a BMI above 30 may not have obesity .... The fact that obesity is a risk factor for other impairments does not mean that individuals with obesity necessarily have any of these impairments. It means that they are at greater than average risk for developing the other impairments").  In sum, I find that the ALJ did not err in failing to specifically discuss Plaintiff's alleged obesity.

### 3.   The ALJ Was Entitled To Use The Disability Onset Date Alleged By Plaintiff

Plaintiff next argues that the ALJ erred by not recognizing an earlier disability onset date, in particular, Plaintiff avers that his disability onset date should have been at least one month earlier (approximately April 24, 2007), instead of on the date of Plaintiff's first back surgery (May 18, 2007).  Plaintiff contends that the ALJ committed an "abuse of discretion" in finding that his alleged onset of disability date was May 18, 2007 (Pl.'s Br. at 7).  Plaintiff's argument is not well-taken.

 Plaintiff's disability date was not a fact found by the ALJ.  Rather, the disability onset date (May 18, 2007) is the date that Plaintiff alleged he became disabled in his application for benefits (Tr. 126).  Plaintiff never previously alleged a different disability onset date, nor did Plaintiff seek to amend his disability onset date.  Quite simply, the ALJ did not commit any error in relying upon the disability onset date that Plaintiff himself alleged.

### 4.   The ALJ Did Not Err In Failing To Find Medical Support For Plaintiff's Requirement To Elevate His Legs Throughout The Day

Plaintiff next argues that the ALJ erred in concluding that there was no "medical basis for the frequent rest or for elevation of [Plaintiff's] leg" (Tr. 24).  Although the ALJ found that Plaintiff was limited due to his back and knee conditions, the ALJ did not fully credit Plaintiff's subjective

complaints, particularly his alleged need to elevate his leg and frequently rest during the day (Tr. 24, 47, 49). Substantial evidence supports the ALJ's conclusion because, as the ALJ noted, after Plaintiff's second back surgery, he returned to work with no limitations and continued working until November 2008, when he was laid off (Tr. 24). Thereafter, Plaintiff's treatment records were focused primarily on his knee condition, as indicated by the ALJ (Tr. 24). With regard to Plaintiff's knee condition, the ALJ noted that the results from a November 2009 examination were consistent with the RFC assessment (Tr. 24). Although Plaintiff received significant treatment for both his back and knee condition, the ALJ accurately noted that no treating or examining source indicated a need to frequently rest or elevate his legs (Tr. 24), and Plaintiff does not point to any evidence in the record so indicating, except for an August 2010 report submitted by Plaintiff to the Appeals Council. This report, however, cannot be part of the substantial evidence review since it was not submitted to the ALJ. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

### 5.      The ALJ's Credibility Determination Is Supported By Substantial Evidence

Plaintiff next argues that the ALJ's credibility determination "lacks clarity" and is deficient (Pl. Br. at 3). The ALJ found that Plaintiff's back condition and knee injury could be expected to cause pain and sharply limit both his exertional capacity and range of motion (Tr. 24). As a result, the ALJ found that Plaintiff was limited to sedentary work with the option to sit or stand at will, only occasional stooping, and no performance of several other postural activities (Tr. 23-24). However, the ALJ stated that he could find no medical basis for Plaintiff's need to frequently rest or to elevate his legs and that he did not find Plaintiff credible concerning those alleged limitations (Tr. 24).

This Court does not make its own credibility determinations. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *see also Lawson v. Comm'r of Soc. Sec.*, 192 Fed. App'x.

521, 528 (6th Cir. 2006). The Court cannot substitute its own credibility determination for the ALJ's. The Court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed ...." *Kuhn v. Comm'r of Soc. Sec.*, 124 Fed. App'x. 943, 945 (6th Cir. 2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the deferential "substantial evidence" standard. "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x. 485, 488 (6th Cir. 2005). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007).

The ALJ provided a detailed discussion of his reasons for finding that Plaintiff's subjective complaints – in particular his need to rest and to elevate his legs – were not fully credible (Tr. 24). Indeed, the ALJ accurately summarized the medical evidence and then tailored an RFC to fit the physical limitations established by the medical evidence in the record. Plaintiff does not contend that the ALJ somehow misstated the medical evidence, rather Plaintiff avers that the ALJ "summarily" discounted Plaintiff's credibility. What Plaintiff's argument ignores, however, is the ALJ's lengthy (and accurate) discussion of the medical evidence immediately prior to his decision to discount Plaintiff's credibility. Simply put, I find that the ALJ's credibility determination is supported by substantial evidence, since it is based upon an accurate recitation of the medical evidence contained in the record. In this matter, the ALJ's credibility determination should not be disturbed on appeal. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990); *see also Infantado v. Astrue*, 263 Fed. App'x 469, 475-76 (6th Cir. 2008).

        6.      The Appeals Council Considered The Additional
                Evidence Produced By Plaintiff

Finally, Plaintiff argues that the Appeals Council erred by not considering the additional evidence provided by Plaintiff, in particular, an August 2010 report filled out by Plaintiff's treating physician, Dr. Garfield.  Plaintiff's argument is not well-taken, as the Appeals Council did, in fact, acknowledge receipt of the document in question.  In April 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, but then vacated the denial in August 2010 upon the request of Plaintiff's counsel (Tr. 6-14).  In October 2010, the Appeals Council again denied review (Tr. 1-5).  In its denial (Tr. 5), the Appeals Council specifically acknowledged receiving the August 2010 medical source statement from Dr. Garfield, identified as Exhibit 20F (Tr. 607-611).  Plaintiff's argument that the Appeals Council committed reversible error by failing to consider the additional evidence produced by Plaintiff is simply belied by the record.

Furthermore, since Dr. Garfield's opinion was not before the ALJ and was presented for the first time to the Appeals Council, it may not be considered by this Court in deciding whether substantial evidence supports the ALJ's decision.  The Sixth Circuit recognizes that "where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted).  The only exception to this prohibition is that the Court may remand a case and "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding" 42 U.S.C. § 405(g) (referred to as a "Sentence Six" remand).

To meet the standard for a Sentence Six remand, it must be shown that the evidence is both new and material and that good cause exists for the failure to include such evidence into the record in the prior proceeding. *See Hollon ex. rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006). Plaintiff does not request a Sentence Six remand in his motion for summary judgment and, in any event, there are not sufficient grounds in this matter to order one. Dr. Garfield's opinion is not material and there no good cause for failing to present Dr. Garfield's opinion to the ALJ. Dr. Garfield's opinion is not material because it contains no indication that the described limitations applied to Plaintiff's conditions as they existed prior to the ALJ's decision. *See Sizemore v. Sec'y of Health and Human Serv's.*, 865 F.2d 709, 711 (6th Cir. 1988) (A claimant will satisfy the requirement that the evidence be material if "there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence"). Finally, Plaintiff has not shown that he had good cause for not obtaining and submitting the opinion from Dr. Garfield prior to the ALJ's decision. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citation omitted) (good cause exists when a claimant demonstrates a reasonable justification for failing to acquire and present the evidence for inclusion in the ALJ hearing). Dr. Garfield had been treating Plaintiff since early 2007 (Tr. 221), and there is no indication that he was unable to provide the opinion at issue prior to the ALJ's decision. A Sentence Six remand pursuant to 42 U.S.C. § 405(g) to reopen the record and have the ALJ consider Dr. Garfield's August 2010 report is simply not warranted in this case.

## III.    RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgement be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings and conclusions of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address  each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  December 20, 2011

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was served on the parties of record on this date, December 20, 2011, electronically.*

s/Melody R. Miles
*Case Manager to Magistrate Judge Mark A. Randon*
*(313) 234-5542*